AO 106 (Rev. 04/10) Application for a Search Warrant

# UNITED STATES DISTRICT COURT

for the

Southern District of Ohio

FILED
RICHARD W. NAGEL
CLERK OF COURT

2021 JUL 26 PM 5: 36

U.S. DISTRICT COURT
SOUTHERN DIST. OHIO
EAST. DIV. COLUMBUS

| In the Matter of the Search of | ) | |
| *(Briefly describe the property to be searched or identify the person by name and address)* | ) ) ) | Case No. 2:21-mJ-489 |
| Chronic Pain Resources, LLC 4207 Gantz Rd. Grove City, Ohio 43123 | ) ) ) | |

## APPLICATION FOR A SEARCH WARRANT

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location)*:

Chronic Pain Resources, LLC, located at 4207 Gantz Rd., Grove City, Ohio 43123, which is further described in detail in Attachment A. See Attachment A.

located in the      Southern      District of      Ohio      , there is now concealed *(identify the person or describe the property to be seized)*:

See Attachment B.

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:

☑ evidence of a crime;

☑ contraband, fruits of crime, or other items illegally possessed;

☑ property designed for use, intended for use, or used in committing a crime;

☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
| --- | --- |
| 18 U.S.C. 1347 | Health Care Fraud |
| 21 U.S.C. 841 | Illegal Drug Distribution |
| 18 U.S.C. 1035 | False Statements in Health Care Matters |

The application is based on these facts:

See Attached Affidavit

☑ Continued on the attached sheet.

☐ Delayed notice of _____ days (give exact ending date if more than 30 days: _____ ) is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

*Applicant's signature*

Ryan Houston, Special Agent- HHS-OIG
*Printed name and title*

Sworn to before me and signed in my presence.

Date: 7/26/2021

City and state: Columbus, Ohio

*Judge's signature*

Elizabeth A. Preston Deavers, U.S. Magistrate Judge
*Printed name and title*

## Attachment A

*Property to be searched*

The property to be searched is Chronic Pain Resources, LLC, located at 4207 Gantz Rd., Grove City, Ohio 43123. The requested location to be searched is pictured below and further described as a 6,206 square-foot single-story brown brick medical office building with a red and white sign on the left front of the structure displaying "CPR" in large white letters against a red background with "CHRONIC PAIN RESOURCES" written below.



## Attachment B

The items requested to be subject to search and seizure include the following items related to Chronic Pain Resources, LLC, Dr. Gulam Mukhdomi, and/or Dr. Abida Makhdumi from January 1, 2017 to the present:

(A.) Patient files, any and all documents, hard copy and electronic concerning Medicaid, Medicare, private insurance programs or any other public or private health care benefits program including but not limited to patient charts, files, medical records, progress notes, consultations, laboratory and diagnostic reports, authorizations, medication lists, correspondence, insurance claim forms, physician's orders, prescriptions, and prescription information including, but not limited to, information stored on hard copy or computer hardware, computer software, computer-related documentation, passwords and data security devices.

(B.) Billing records including: contracts with insurers, correspondence to and from insurers/patients, billing files, patient account records, claim forms, insurance forms, invoices, remittance statements, cash receipt books and/or ledgers, checks/warrants, and:

    (1) Records relating to billing, including letters, faxes, notes, and explanation of benefits forms;

    (2) Records and/or ledgers and/or journals that may reveal, indicate or contain information pertaining to Medicaid and Medicare program billings or any other public or private health care benefits program;

    (3) Manuals, notebooks, billing code lists, and memoranda used for billing purposes; and

    (4) All inventory and other documentation recording the receipt, handling and dispensing of supplies, medical or otherwise.

(C.) Financial records, including but not limited to:

    (1) Bank statements, records of deposits, cash receipts, journals and canceled checks for corporate, individual or joint accounts; and

(2)  Financial statements, accounting records, and tax records including but not limited to bookkeeping records to include both paper records and digital records (Quickbooks, Peachtree, etc.) used to record income and report expenses, accounts receivable ledgers, accounts payable ledgers, employment tax records to include payroll records and quarterly and annual tax filings, and reports on assets/liabilities and/or investments; and

(3)  Checking account(s); signature cards and application forms, monthly account ledgers, deposit tickets and other credit items, withdrawal slips, deposit items; and

(4)  Saving Account(s); Signature cards and application forms, monthly account ledgers, deposit tickets and other credit items, withdrawal slips, deposit items; and

(5)  Time Certificates of Deposit; Certificates or other evidence of payment, account ledger or records reflecting original date, amount, term, rate, registered owner(s), and other conditions negotiability, signature and application forms, treasury notes; and

(6)  Clubs and Other Open Account(s); Signature and application forms, deposit tickets, monthly account ledgers; and

(7)  Safe Deposit Box; Signature cards, contracts/leases, access tickets/ledgers; and

(8)  Loans; Loan applications (made or rejected), financial statements, monthly account ledger, correspondence, credit files, refinance records, collection files and memorandums; and

(9)  Currency Exchanges; All documents relating to the exchange of currency including correspondence, teller records, and vault records; and

(D.) Any and all records relating to office procedures and policies regarding health care claims, coding and billing, insurance company denials, re-submission of denied claims, requests for refunds, billing protocols and procedures, billing guidelines, billing memoranda, Medicaid and Medicare manuals, Medicaid and Medicare letters and updates, and instructions or notes to employees.

(E.) Any and all personnel and payroll files and records including documents reflecting names, social security numbers, dates of birth, addresses, duration of employment, professional licensure and qualifications, job descriptions, criminal history records/logs, training records and certificates, calendars, appointment books, employment contracts, daily planners, schedules, duties, and reasons for separation or termination from employment of all present and past officers, employees, and independent contractors.

(F.) All documents concerning the mailing of, or electronic submission of claims, and the receipt of moneys including envelopes, mailing logs, correspondence, and records of receipt.

(G.) Documents that serve the purpose of explaining the way the computer hardware, programs and data are used, including manuals for computer equipment and software.

(H.) Computers or storage media used as a means to commit the violations described above.

    1. For any computer or storage medium whose seizure is otherwise authorized by this warrant, and any computer or storage medium that contains or in which is stored records or information that is otherwise called for by this warrant (hereinafter, "COMPUTER"):

        a. evidence of who used, owned, or controlled the COMPUTER at the time the things described in this warrant were created, edited, or deleted, such as logs, registry entries, configuration files, saved usernames and passwords,

3

documents, browsing history, user profiles, email, email contacts, "chat," instant messaging logs, photographs, and correspondence;

b.  evidence of software that would allow others to control the COMPUTER, such as viruses, Trojan horses, and other forms of malicious software, as well as evidence of the presence or absence of security software designed to detect malicious software;

c.  evidence of the lack of such malicious software;

d.  evidence of the attachment to the COMPUTER of other storage devices or similar containers for electronic evidence;

e.  evidence of counter-forensic programs (and associated data) that are designed to eliminate data from the COMPUTER;

f.  evidence of the times the COMPUTER was used;

g.  passwords, encryption keys, and other access devices that may be necessary to access the COMPUTER;

h.  documentation and manuals that may be necessary to access the COMPUTER or to conduct a forensic examination of the COMPUTER;

i.  records of or information about Internet Protocol addresses used by the COMPUTER;

j.  records of or information about the COMPUTER's Internet activity, including firewall logs, caches, browser history and cookies, "bookmarked" or "favorite" web pages, search terms that the user entered into any Internet search engine, and records of user-typed web addresses;

k.  contextual information necessary to understand the evidence described in this attachment.

l.  Routers, modems, and network equipment used to connect computers to the Internet.

4

2.    As used above, the terms "records" and "information" includes all forms of creation or storage, including any form of computer or electronic storage (such as hard disks or other media that can store data); any handmade form (such as writing); any mechanical form (such as printing or typing); and any photographic form (such as microfilm, microfiche, prints, slides, negatives, videotapes, motion pictures, or photocopies).

3.    The term "computer" includes all types of electronic, magnetic, optical, electrochemical, or other high speed data processing devices performing logical, arithmetic, or storage functions, including desktop computers, notebook computers, mobile phones, tablets, server computers, and network hardware.

4.    The term "storage medium" includes any physical object upon which computer data can be recorded.  Examples include hard disks, RAM, floppy disks, flash memory, CD-ROMs, and other magnetic or optical media.

*Your Affiant knows that it is common practice among medical providers to maintain all-inclusive patient files, which may reference and include documents and information which pre-date the range of items sought in this search warrant.  Such documents, if they exist, may be critical in determining whether CPR fraudulently billed Medicaid, Medicare, and private insurance. In order to maintain the integrity of the patient files, your affiant seeks to seize complete files, which may include documents with dates earlier than the range requested in the attachment.

### Special Authorization

Based on circumstances presented in the accompanying affidavit, your Affiant requests authorization for the following:

Should an on-site computer imaging not be possible then permission is sought to seize any computer and related equipment as described above for an off-premises search.  Your Affiant knows that in order to retrieve data from computer systems without damaging the

data, the software used by CPR must be identified, isolated, and preserved.  In addition, sophisticated computer users may use security devices such as passwords, encryption, and data destruction programs designed to prevent unauthorized intrusion.  The process of retrieval can be time-consuming and may require expert assistance.  Only if this is not feasible on-site will it be necessary to seize computer hardware.

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF OHIO**
**EASTERN DIVISION**


| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | |
| | : | |
| | : | **AFFIDAVIT IN SUPPORT OF** |
| v. | : | **SEARCH WARRANT** |
| | : | |
| | | |
| CHRONIC PAIN RESOURCES LLC | : | |
| 4207 GANTZ RD. | : | |
| GROVE CITY, OHIO 43123 | : | |

- - - - - - - - - - - - - - - - - - - - - - -


I , Ryan Houston, a Special Agent with the United States Department of Health and Human Services (HHS), being duly sworn, depose and state as follows;


## BACKGROUND

1. I am a Special Agent employed by the United States Department of Health and Human Services (HHS), Office of Inspector General (OIG), Office of Investigations (OI). I have been so employed since January 2011. I am an investigative or law enforcement officer of the United States within the meaning of Section 2510 (7) of Title 18, United States Code, in that I am empowered by law to conduct investigations and to make arrests for federal felony offenses.

2. As part of my duties I am authorized to conduct investigations, audits and inspections in connection with the administration and enforcement of laws, regulations, orders, contracts and programs in which the U.S. Department of Health and Human Services

(HHS) is, or may be, a party of interest, and perform other duties on behalf of the Secretary of the Department of Health and Human Services. My chief responsibility is the investigation of fraud involving Federal Health Care Programs. As a Special Agent with the HHS-OIG-OI, I have received basic criminal investigator training as well as specialized training in the investigation of fraud and financial crime. Previously, I was employed as a Special Agent with the Ohio Attorney General's Office, Medicaid Fraud Control Unit (MFCU) for seven (7) years. My primary responsibility during this seventeen (17) year period has been the investigation of criminal fraud against the health care programs commonly known as Medicare and Medicaid.

3. The information contained in this affidavit is either personally known to me, based upon my interviews of various witnesses and the review of various records and publicly available information, or has been relayed to me by other agents or other sworn law enforcement personnel.

4. This affidavit is being submitted for the purposes of securing search warrants for the "PREMISES", namely the business offices of CHRONIC PAIN RESOURCES, LLC (hereinafter "CPR"), a pain management medical practice, whose offices are located within the Southern District of Ohio.

   a. CPR's three (3) known business and operating locations include 1.) 855 S. Wall St., Columbus, Ohio 43206, 2.) 4207 Gantz Rd., Grove City, Ohio 43123, and 3.) 4215 Gantz Rd., Grove City, Ohio 43123.

5. According to CPR's website at www.cproh.com, CPR was founded in 2009 by Dr. Gulam Mukhdomi (GULAM). Furthermore, CPR's website lists Mukhdomi and Dr. Abida Makhdumi (ABIDA) as its sole medical practitioners. Finally, CPR's website identifies two practice locations for CPR: 1.) 855 S. Wall St., Columbus, Ohio and 2.) 4215 Gantz Rd., Grove City, Ohio.

6. Because this affidavit is being submitted for the limited purpose of securing a search warrant, I have not included every fact known to me concerning this investigation. I have set forth only the facts that I believe are necessary to support the requested search warrant.

7. Based upon my training and experience and the facts set forth in this affidavit, there is probable cause to believe that violations of 18 U.S.C. § 1035 (False Statements Relating to Health Care Matters), 18 U.S.C. § 1347 (Health Care Fraud), and 21 U.S.C. § 841 (Illegal Drug Distribution) have been committed by individuals operating CPR and that evidence related to such violations may be found on the PREMISES.

## STATUTORY VIOLATIONS

8. Based upon the information set forth below, I have reason to believe and do believe that certain evidence supporting violations of the following federal criminal statutes is presently being maintained or stored on the PREMISES.

9. 18 U.S.C. § 1035 prohibits a person from knowingly and willfully falsifying, concealing, or covering up by trick, scheme or device a material fact in connection with the delivery of or payment for health care benefits, items, or services involving a "health care benefit program" as that term is defined in 18 U.S.C. § 24(b). Similarly, section 1035 makes it illegal for a person to knowingly and willfully make a materially

3

false, fictitious or fraudulent statement or use a writing or document knowing that it contains a materially false, fictitious or fraudulent statement in connection with the delivery of or payment for health care benefits, items, or services involving a "health care benefit program" as that term is defined in 18 U.S.C. § 24(b). Both violations carry a maximum prison sentence of five years imprisonment.

10. 18 U.S.C. § 1347 prohibits, in connection with the delivery of or payment for health care benefits, items, or services, a person from knowingly and willfully executing or attempting to execute a scheme to defraud any "health care benefit program" as that term is defined in 18 U.S.C. § 24(b), or obtaining by false or fraudulent pretenses, statements, or promises, any money or property under the care, custody, or control of any "health care benefit program" as that term is defined in 18 U.S.C. § 24(b). Such is a violation of 18 U.S.C. § 1347 and carries a maximum term of imprisonment of ten years. This activity is a Specified Unlawful Activity as defined under 18 U.S.C. §1961.

11. 21 U.S.C. § 841 prohibits any person from knowingly or intentionally manufacturing, distributing, or dispensing, or possessing with intent to manufacture, distribute, or dispense, a controlled substance. Furthermore, in the instance when a licensed medical provider is involved, a prescription for a controlled substance must be issued for a legitimate medical purpose by an individual practitioner acting in the usual course of his/her professional practice.

**Medical Benefit Programs**

12. CPR has provided medical services to recipients of Medicare, Medicaid, and other healthcare benefit programs as that term is defined in Section 24(b) of Title 18, United States Code.

4

13. Section 24(b) of Title 18, United States Code, defines a "healthcare benefit program" as "any public or private plan or contract, affecting commerce, under which any medical benefit, item, or service is provided to any individual, and includes any individual or entity who is providing a medical benefit, item, or service for which payment may be made under the plan or contract."

14. Specifically, Medicare is a federal healthcare program that provides basic medical coverage for persons age 65 and over who are entitled to Social Security Benefits and for persons under age 65 who suffer from certain disabilities. Medicare is administered by the Centers for Medicare and Medicaid Services (CMS), an agency of the United States Department of Health and Human Services (HHS). Individuals who received benefits under Medicare are often referred to as Medicare "beneficiaries."

15. Medicare is comprised of four parts: hospital insurance (Part A), medical insurance (Part B), Medicare Advantage (Part C), and prescription drug benefits (Part D). Medicare Part B helps pay the cost of physician services, medical equipment and supplies, and other health services and supplies not paid by Part A.

16. Prior to participation in the Medicare Provider Program and receipt of a provider number, a provider signs an agreement with the United States. Upon acceptance into the Program, the provider agrees to submit to certain regulations issued by the United States.

17. Upon receipt of a Provider Number, the provider can submit claims directly to Medicare. As part of the provider agreement, the provider agrees to accept the terms and regulations issued by Medicare and the United States. Providers attest to their

responsibility to comply with Federal and Medicare laws and regulations on a recurring basis.

18. Medicare reimbursement requests for professional services, such as those from a physician for medical services, are made on a Health Insurance Claim Form (Form HCFA 1500). Each claim form submitted for reimbursement requires the diagnosis, date of service, procedure code, type of services provided, charges, name of and provider number for the entity providing the services, and a designation of the selected method of reimbursement. These forms require the provider to certify that the services on the form were "medically indicated and necessary for the health of the patient" and that the claimed services are true and accurate. The form further warns that any false claim, documents, or concealing of a material fact may be prosecuted.

19. Providers are required to keep patients' written medical records accurately and truthfully. According to the CMS rules governing health care providers, records must be kept at least six years. These written medical records serve as documentary support for the claim forms submitted by a provider to the programs and can be used to review the claims.

20. Medicaid is a federal health care benefit program designed to provide medical services, equipment, and supplies to certain individuals and families with low income pursuant to the Social Security Act (Title 42, United States Code, Section 1396, et seq.). Medicaid is a health care benefit program as defined in 18 U.S.C. § 24(b). Approximately 60% of the funding for the Ohio Medicaid program is supplied by HHS. The Ohio Medicaid program is administered by the State of Ohio, through the Ohio Department of Medicaid (ODM).

21. As part of the federally approved state plan, ODM has elected to contract with Medicaid Managed Care Organizations (MCOs) through contracts known as Contractor Risk Agreements (CRAs), which must conform to the requirements of 42 U.S.C. §§1395mm and §1396b(m), along with any related federal rules and regulations. 42 U.S. Code § 1396u-2. MCOs are health insurance companies that provide coordinated health care to Medicaid recipients. The MCOs contract directly with healthcare providers, including hospitals, doctors, and other health care providers to coordinate care and provide the health care services for Medicaid recipients. Providers who contract with an MCO, are known as Participating Providers. These providers likewise must enter into a "provider agreement" with the MCO in which the Participating Provider agrees to comply with all applicable state and federal statutes, regulations and guidelines. Participating Providers are assigned a unique provider identification number, which is necessary to be eligible to bill and receive reimbursement for services rendered to Medicaid recipients. As part of the Ohio Medicaid Program, Medicaid MCOs and the Participating Providers must furnish medical and health-related services pursuant to the state plan. Pursuant to the CRAs, ODM distributes the combined state and federal Medicaid funding to the MCOs, which then pay Participating Providers for treatment of Medicaid recipients. As the administrator of the Ohio Medicaid Program, ODM must track all services received by recipients, whether enrolled directly with ODM or enrolled with a MCO. Therefore, Medicaid MCOs are required to submit to ODM encounter data, which includes detailed records of the services a Medicaid recipient received from a Participating Provider.

22. ODM pays Medicaid claims submitted to it by valid Medicaid providers.

23. A participating Medicaid provider is a person or business who agrees to (1) provide the service, (2) submit the claim, and (3) accept as payment in full the amount paid by the Ohio Medicaid program. The provider signs a Medicaid participation agreement, which requires them to keep records necessary to fully disclose the services provided to Medicaid patients. To receive Medicaid reimbursement for covered services, the provider electronically submits billing data to ODM, which pays the provider either by mail or electronic transfer.

24. Medicaid pays participating health care providers on the basis of reasonable charges for covered services provided to beneficiaries. They assign to each provider a unique billing Provider Identification Number (PIN). Providers agree to know Medicaid reimbursement policies, which are communicated via regulations, manuals and newsletters.

25. Medicaid providers agree to bill only for services actually rendered that are medically necessary to diagnose and treat illness or injury and for which the provider maintains adequate documentation. Medicaid currently requires health care providers to retain records of services for six (6) years from the date of payment for such services.

26. Pursuant to Ohio Administrative Code Sections 5160-1-01(a) and (b), medical necessity is defined as: "procedures, items, or services that prevent, diagnose, evaluate, correct, ameliorate, or treat an adverse health condition such as an illness, injury, disease or its symptoms, emotional or behavioral dysfunction, intellectual deficit, cognitive impairment, or developmental disability…." Further, "[c]onditions of medical necessity are met if all the following apply:

(1) Meets generally accepted standards of medical practice;
(2) Clinically appropriate in its type, frequency, extent, duration, and delivery setting;

8

(3) Appropriate to the adverse health condition for which it is provided and is expected to produce the desired outcome;
(4) Is the lowest cost alternative that effectively addresses and treats the medical problem;
(5) Provides unique, essential, and appropriate information if it is used for diagnostic purposes; and
(6) Not provided primarily for the economic benefit of the provider nor for the convenience of the provider or anyone else other than the recipient."
O.A.C. §5160-1-01(c).

27. Submission of a claim to a healthcare benefit program, whether public or private, involves representations by the provider that the services rendered were of a quality that met professionally recognized standards which include: (1) informed consent; (2) were medically necessary; and (3) were supported by documentation of such necessity.

**CPR's Business Offices**

28. CPR currently operates at three (3) different business locations within the Southern District of Ohio. The first practice location is located at 855 S. Wall St., Columbus, OH. This location can be further described as a physician's office inside a 5,672 square-foot two-story, brown brick building with a portion of the entrance covered in light gray siding and light-yellow trim. Furthermore, a light-yellow awning with light yellow pillars is located immediate outside the entrance to the building. The numbers "855" are listed across the top facing of the awning. Finally, a wooden white and red sign between the parking lot and the street displays the letters "CPR" alongside a telephone number for the practice.

29. According to a search of Franklin County Auditor property records, there is no record found for 855 S. Wall St., Columbus, Ohio 43206. Rather, the property record reflects an entry for 885 S. Wall Street, Columbus, Ohio which is owned by Mukhdomi Properties, LLC and lists the owner mailing address as 4215 Gantz Rd., Grove City, Ohio 43123.

9

30. The second practice location is located at 4207 Gantz Rd., Grove City, Ohio. This practice location can be further described as a 6,206 square-foot single-story brown brick medical office building with a red and white sign on the left front of the structure displaying "CPR" in large white letters against a red background with "CHRONIC PAIN RESOURCES" written below.

31. According to Franklin County Auditor property records, the property at 4207 Gantz Rd., Grove City, Ohio is also owned by Mukhdomi Properties, LLC, which lists the owner mailing address as 4207 Gantz Rd., Grove City, Ohio.

32. Finally, a third business location is located at 4215 Gantz Rd., Grove City, Ohio 43123. This location can be further described as a 2,984 square-foot split-level brown brick residence which has been converted into a commercial office space. Furthermore, the residence has an attached two-car garage located to the right of the entrance. Finally, the central entrance to the property is marked overhead displaying in large numbers "4215".

33. According to Franklin County Auditor property records, the property at 4215 Gantz Rd., Grove City, Ohio is owned by Gulam Mukhdomi and Abida Mukhdomi.

34. Although CPR's website still currently lists 4215 Gantz Rd. as the Grove City practice location, information from the Ohio Department of Health (ODH) has confirmed this location is now the site of CPR's lab, which was inspected and certified as a CLIA (Clinical Laboratory Improvement Amendments) approved lab on October 19, 2020. The CLIA-certified lab is officially listed under the business name "Chronic Pain Resources LLC".

10

35. Finally, according to Ohio Secretary of State business filings, the 10/9/2012 Articles of Incorporation for Mukhdomi Properties, LLC lists "Gulam Jeelani Mukhdomi" as the registered agent of Mukhdomi Properties, LLC.

## PROBABLE CAUSE

36. CPR is a pain management medical practice located in the Southern District of Ohio.

37. According to Ohio Secretary of State records, the Initial Articles of Incorporation for CPR were filed on 9/29/2008, which listed Taif Mukhdomi as the registered agent for the business.

38. GULAM obtained a license to practice medicine in the State of Ohio on or about 8/12/2003. To date, GULAM is still actively licensed to practice medicine in the State of Ohio.

39. ABIDA obtained a license to practice medicine in the State of Ohio on or about 12/1/2003. To date, ABIDA is still actively licensed to practice medicine in the State of Ohio.

40. A review of Medicare provider enrollment documents shows GULAM opened CPR on 10/1/2008 at 9000 N. Main St., Dayton, Ohio. Medicare documents list GULAM as the sole owner and president of CPR.

41. Furthermore, Medicare provider enrollment records reflect CPR moved to 855 S. Wall St., Columbus, Ohio effective 11/1/2013. In addition, Medicare records reflect that effective 1/1/2014, CPR added a practice location at 4215 Gantz Rd., Grove City, Ohio.

42. Medicare records also show ABIDA re-assigned her benefits to CPR effective 6/1/2010.

11

## Medicare Billing

43. As part of our analysis and investigation, I am aware of CPR's billing practices to Medicare.

44. From 1/1/2017 through 12/4/2020, CPR directly billed Medicare Part B for approximately $3.5 million and received payment of approximately $1.1 million for services allegedly rendered.

45. The top procedure codes billed by CPR were:

- 99213 (Established patient office or other outpatient visit, typically 15 minutes)
  - Approximately $1.1 million billed; Approximately $341,000 paid
- 64483 (Injections of anesthetic and/or steroid drug into lower or sacral spine nerve)
  - Approximately $309,000 billed; Approximately $99,000 paid
- 64635 (Destruction of lower or sacral spinal facet joint nerves using imaging guidance)
  - Approximately $266,000 billed; Approximately $82,000 paid

46. According to Medicare Part B billing records, CPR also began billing for procedure code G0481 (Drug Test, Definitive) for dates of service on and after 10/26/2020.

- Specifically, for dates of service 10/26/2020 through 11/16/2020, CPR billed 60 claims of G0481 totaling $15,000, resulting in $8,612.45 in payments from Medicare.

## Ohio Medicaid Billing

47. In addition, as part of our analysis and investigation, I am aware of CPR's billing practices to Ohio Medicaid for certain billing codes.

12

48. According to Ohio Medicaid claims data, from 3/2/2015 through 4/7/2021, CPR billed Ohio Medicaid approximately $17.6 million and received approximately $4 million in payments for services allegedly rendered.

49. The top procedure codes billed by CPR to Ohio Medicaid were:

- 99213 (Established Patient Office/ Outpatient Visit)

  - Approximately $7.8 million billed; Approximately $1.9 million paid

- 99204 (New Patient Office/Outpatient Visit)

  - Approximately $1.3 million billed; Approximately $304,000 paid

- 80307 (Drug Test Presumptive)

  - Approximately $472,000 billed; Approximately $214,000 paid

**Investigation**

50. On July 28, 2020, the Ohio Board of Pharmacy received a complaint regarding CPR. The complainant, who is a medical professional at a nearby area business, alleged witnessing "suspicious activity" at the 4207 Gantz Rd., Grove City, Ohio location, such as numerous patients arriving at the practice with out of state license plates including Michigan, Pennsylvania, New York, Kentucky, and Florida. The complainant also reported witnessing CPR staff interacting with patients in the parking lot and appeared to hand out prescriptions without the patients even entering the building. Finally, the complainant also reportedly witnessed some patients arrive, enter building, and leave all within 5 minutes, which led the complainant to believe GULAM is simply just handing out pain medication prescriptions at CPR.

13

51. On October 15, 2020, agents interviewed U.B., who worked at the Grove City CPR office from April 2019 until June 2019. According to U.B., GULAM instructed U.B. to falsify patient records by copying vitals from the previous office visit. U.B. stated GULAM also forced patients to undergo unnecessary injections, which were determined by a patient's insurance rather than the patient's needs. U.B. claimed staff joked that patients with United Health Care insurance always had to undergo more injections. U.B. believed the injections were motivated by money rather than by patient need.

52. On October 15, 2020, agents interviewed M.H., who formerly worked at CPR in early 2019. M.H. stated she was pressured by GULAM to schedule more injections for patients. M.H claimed the number of injections was driven by the patient's insurance, rather than the needs of the patient. M.H. stated GULAM threatened to withhold patient's pain medication prescriptions if they did not agree to undergo the injection procedures.

53. On October 15, 2020, agents interviewed E.B., a former CPR employee who primarily worked with ABIDA at the Columbus location, but also occasionally worked with GULAM at the Grove City office. E.B. stated patients at CPR were forced to undergo unnecessary injections because they made CPR a lot of money. E.B. added patients who refused the injections weren't given their pain medication prescriptions and/or were dismissed from the practice. E.B., who left CPR in November 2019 after receiving a nursing degree, claimed GULAM and ABIDA did not establish actual treatment plans for patients, rather they just prescribed pain medications and conducted injections with no real end goal in sight. E.B. claimed most office visits lasted less than 5 minutes and although CPR conducted urine drug screens (UDS), E.B. did not believe GULAM or ABIDA actually paid attention to the UDS results.

54. On October 22, 2020, agents interviewed A.D., a former employee and patient at CPR. A.D. stated patients were required to submit urine samples for UDS. All UDS were then sent off to the lab for additional confirmation testing regardless of the results of the initial preliminary UDS. According to A.D., patients waited for hours to be seen for less than a 5-minute office visit, where the patient provided a urine sample and received a refill on his/her pain medication. A.D. stated CPR did not even collect patient vitals during the office visit. A.D. estimated GULAM saw 60-70 patients per day. A.D. added GULAM forced patients to undergo repeated unnecessary injections by withholding their pain medications if they refused. A.D. stated GULAM conducted the injections simply to make money and described GULAM as "a money hungry man".

55. On April 23, 2021, agents interviewed D.P., who worked at CPR's Columbus office around March 2020. D.P. reportedly first learned of CPR through D.P.'s federal probation officer, who attends the same mosque as ABIDA. According to D.P., ABIDA reportedly approached D.P.'s probation officer about her willingness to hire someone with a prior felony conviction to work the front desk at CPR. The probation officer then provided D.P. with ABIDA's contact information.

56. D.P. stated she immediately began noticing red flags at CPR, including ABIDA spending less than 2 minutes with patients and not conducting physical exams or collecting any vitals. D.P. claimed patients received monthly UDS, but ABIDA did not seem to care about the results despite repeated failed screens in the patient charts. D.P. stated during the onset of the pandemic patients just picked up their prescriptions without actually seeing the doctor for an office visit. D.P. claimed patients were forced to undergo injections in order to receive his/her pain medication. D.P. heard ABIDA say, "No injection, no medicine."

57. D.P. reportedly observed many of ABIDA's regular patients just come to the front desk where ABIDA said, "Everything still the same? OK, here's your script. Make your next appointment." D.P. claimed pain medications were "handed out like candy" at CPR. D.P. said CPR was known as "the dope man" due to the amount of pain medications prescribed by GULAM and ABIDA.

58. On December 7, 2020, agents interviewed D.V., a former CPR patient. At the beginning of the interview, D.V. immediately volunteered CPR was her idea of a "pill mill". D.V. stated she began seeing GULAM at the Wall St. office in December 2019. D.V. stated she barely even spoke with GULAM on the first visit, as he did not take any vitals or perform any type of physical exam. Instead, D.V. provided a urine sample for drug testing on the first visit and returned a week later to receive a prescription. D.V., who had never taken any pain medication prior to seeing GULAM, received a 30-day supply of Oxycodone on the second visit. D.V. denied GULAM even discussed the UDS results or her pain at all. D.V. stated, "He (GULAM) wouldn't spend a minute with you." D.V. added, "He was not thorough at all." D.V. recalled receiving her second Oxycodone prescription from the receptionist without seeing GULAM at all.

59. D.V. recalled on another visit, she had an appointment scheduled for 9:40am, but she did not leave until 5:00pm as it appeared staff forgot about her in a waiting room. On that visit, she eventually walked out to find GULAM who quickly wrote her a prescription without any discussion about her pain. D.V. was then still asked to provide a UDS before she left.

60. D.V. reportedly witnessed numerous occasions of other patients also receiving prescriptions from staff without seeing GULAM or ABIDA. On some occasions, D.V. stated she observed a staff member bring prescriptions out to patients in the parking lot without those patients ever even entering the building.

61. D.V. recalled one instance while she was sitting in the parking lot at CPR when another patient approached her vehicle and asked if she was "here for the wait." D.V. explained the unidentified female (female #1) then reportedly told her that female #1 actually brings another female (female #2) to CPR who receives the pain medication prescription from GULAM or ABIDA. Female #1 then drives female #2 to the pharmacy to fill the prescription and female #1 pays female #2 for her pain pills. D.V. stated she was shocked by the story. D.V. stated she then observed an older black female exit CPR and approach female #1, who said, "Ope! Time for me to go!" D.V. then witnessed the two females drive off together.

62. D.V. stated she never received any help from GULAM and during several visits she wasn't even seen in an exam room. D.V. believed many patients simply received their prescriptions without seeing the doctor because there was no way GULAM could see everyone who was there waiting. D.V. described CPR as one of "those bad pill mills you only hear about." D.V. claimed she always felt uncomfortable in the waiting room because she didn't "fit in", as most of the patients appeared to be drug addicts. D.V. stopped seeing GULAM in mid-2020 after GULAM wanted to perform knee injections.

63. On December 9, 2020, agents interviewed L.O., who is a former CPR patient. Before even being questioned, L.O. volunteered that during the onset of the pandemic GULAM was "playing around" by going out to the parking lot with a prescription pad to write prescriptions for pain medications or having other staff take prescriptions out to patients in the parking lot without actually seeing the patients.

64. L.O. stated she always saw GULAM for her office visits, but witnessed many other patients receive prescriptions from the receptionist without seeing the doctor. Despite always seeing GULAM for her prescription, L.O. claimed GULAM never collected any vitals and never performed any physical exam. L.O. explained she often waited 3-4 hours to be seen for less than 5 minutes. L.O. stated she usually provided a UDS and then GULAM provided her with a refill on her pain medication with a prescription that was already filled out before he entered the room. L.O. added her encounters with GULAM occurred at a small table near the receptionist and claimed there was no privacy whatsoever.

65. L.O. reportedly witnessed GULAM tell patients on 6 occasions they had failed a UDS, but he still provided them with prescriptions for pain medications and asked them to come back the following week for another UDS. L.O. reportedly overheard GULAM say, "You better be clean next week!"

66. Upon asking L.O. about fluoroscopy that was billed to Ohio Medicaid for her first visit in December 2019, L.O. denied she ever received any imaging or injections at CPR. According to Ohio Medicaid billing records, CPR billed $203.00 and were paid $43.64 for CPT code 76000 (Fluoroscopy up to 1 Hr Physician) for date of service 12/16/2019 for L.O..

67. L.O. stated her last visit to CPR occurred in August 2020. L.O. stated she left because GULAM was always pushing her and other patients to undergo biweekly injections, which she knew would not be helpful based on her previous experience. L.O. stated GULAM also lost her MRI imaging results on several occasions and did not seem to care about her health or managing her pain. L.O. believed GULAM was only about the money and not about patient care. L.O. said CPR did not even seem like a real medical practice. L.O. added CPR was just about money and handing out prescriptions.

68. On July 15, 2021, agents conducted surveillance at 4215 Gantz Rd., Grove City, Ohio. During the surveillance operation, at 8:59am, agents observed GULAM arrive at the address driving a dark blue Tesla, matching the 2017 dark blue Tesla registered to Chronic Pain Resources with Ohio plate number HCE8458. After exiting the vehicle, GULAM retrieved a brown cardboard box from the trunk of the vehicle. The box, which had no lid, appeared to contain numerous individual plastic bags inside. Agents then watched as GULAM entered the premises at 4215 Gantz Rd through the white door located immediately to the left of the garage door. At 9:01am, GULAM exited the building and returned to his vehicle without the box. Agents then observed GULAM immediately drive next door to the CPR practice at 4207 Gantz Rd., Grove City, Ohio where he entered the building.

69. During the investigation, agents also received and reviewed information regarding T.E., a former CPR patient who began seeing ABIDA in November 2015. During her time at CPR, T.E. received prescriptions from GULAM and ABIDA, which were quickly escalated from 60 Percocet 5-325 in November 2015 to 120 Oxycodone HCL less than a year later in October 2016. In addition, while receiving opioid medications from GULAM and ABIDA, T.E. also received monthly prescriptions of 2mg Alprazolam, a benzodiazepine, from another physician.

70. On March 28, 2018, T.E. received a refill of her 120 Oxydocone HCL 15mg prescription from ABIDA. On April 17, 2018, T.E.'s husband contacted Clinton Township EMS after finding T.E. unconscious on the floor of their apartment after reportedly taking "too much Percocet". EMS arrived moments later and revived T.E. with two doses of Narcan before transporting T.E. to Riverside Hospital where she later checked herself out against medical advice.

71. Despite the April 17, 2018 overdose incident, T.E. returned to CPR and received another 120 count Oxycodone HCL 15 mg prescription from ABIDA on April 25, 2018. T.E. then continued to receive her same monthly opioid prescriptions from ABIDA until her last prescription on September 12, 2018.

72. On September 13, 2018, at approximately 8:33am, T.E.'s family contacted Columbus Fire/EMS to report finding T.E. lying on the floor unresponsive. Columbus EMS arrived on scene but was unable to resuscitate T.E., who was pronounced dead at 9:03am.

73. According to a toxicology conducted by the Franklin County Coroner's Office on the same date, Oxycodone was found in T.E.'s blood at "a known toxic to lethal level" while Alprazolam was also "present at a known toxic level." Following an autopsy conducted by the Franklin County Coroner's Office, Dr. John A. Daniels ruled the manner of death as "accident" with the cause of death as "acute intoxication by the combined effects of oxycodone and alprazolam."

74. Accordingly, based on the foregoing, there is probable cause to believe that GULAM and ABIDA are issuing prescriptions for controlled substances which are outside the course of usual medical practice and not for a legitimate medical purpose. Consequently, there is probable cause to believe that violations of 18 U.S.C. § 1035 (False Statements relating to Health Care Matters), 18 U.S.C. § 1347 (Health Care Fraud), and 21 U.S.C. § 841 (Illegal Drug Distribution), have been committed by individuals at CPR, including GULAM and ABIDA, and that evidence related to such violations may be found on the PREMISES.

## COMPUTERS, ELECTRONIC STORAGE, AND FORENSIC ANALYSIS

75. As described above and in Attachment B, this application seeks permission to search for records that might be found on the PREMISES, in whatever form they are found. One form in which the records might be found is data stored on a computer's hard drive or other storage media. Thus, the warrant would authorize the seizure of electronic storage media or, potentially, the copying of electronically stored information, all under Rule 41(e)(2)(B).

76. *Probable cause.* I submit that if a computer or storage medium is found on the PREMISES, there is probable cause to believe those records will be stored on that computer or storage medium, for at least the following reasons:

a. Based on my knowledge, training, and experience, I know that many healthcare records as well tax, bookkeeping, and accounting records are now stored electronically on computers. Computer files or remnants of such files can be recovered months or even years after they have been downloaded onto a storage medium, deleted, or viewed via the Internet. Electronic files downloaded to a storage medium can be stored for years at little or no cost. Even when files have been deleted, they can be recovered months or years later using forensic tools.

b. Therefore, deleted files, or remnants of deleted files, may reside in free space or slack space—that is, in space on the storage medium that is not currently being used by an active file—for long periods of time before they are overwritten.

c. Wholly apart from user-generated files, computer storage media—in particular, computers' internal hard drives—contain electronic evidence of how a computer has been used, what it has been used for, and who has used it. To give a few examples, this forensic evidence can take the form of operating system configurations, artifacts from operating system or application operation, file system data structures, and virtual memory "swap" or paging files. Computer users typically do not erase or delete this evidence, because special software is typically required for that task. However, it is technically possible to delete this information.

23

   d.  Similarly, files that have been viewed via the Internet are sometimes automatically downloaded into a temporary Internet directory or "cache."

77. *Forensic evidence.*  As further described in Attachment B, this application seeks permission to locate not only computer files that might serve as direct evidence of the crimes described on the warrant, but also for forensic electronic evidence that establishes how computers were used, the purpose of their use, who used them, and when. There is probable cause to believe that this forensic electronic evidence will be on any storage medium in the PREMISES because:

   a.  Data on the storage medium can provide evidence of a file that was once on the storage medium but has since been deleted or edited, or of a deleted portion of a file (such as a paragraph that has been deleted from a word processing file). Virtual memory paging systems can leave traces of information on the storage medium that show what tasks and processes were recently active.  Web browsers, e-mail programs, and chat programs store configuration information on the storage medium that can reveal information such as online nicknames and passwords. Operating systems can record additional information, such as the attachment of peripherals, the attachment of USB flash storage devices or other external storage media, and the times the computer was in use. Computer file systems can record information about the dates files were created and the sequence in which they were created, but this information can later be falsified.

   b.  Forensic evidence on a computer or storage medium can also indicate who has used or controlled the computer or storage medium.  For example, registry information, configuration files, user profiles, e-mail, e-mail address books, "chat," instant

24

messaging logs, photographs, the presence or absence of malware, and correspondence (and the data associated with the foregoing, such as file creation and last-accessed dates) may be evidence of who used or controlled the computer or storage medium at a relevant time.

c. A person with appropriate familiarity with how a computer works can, after examining this forensic evidence in its proper context, draw conclusions about how computers were used, the purpose of their use, who used them, and when.

d. The process of identifying the exact files, blocks, registry entries, logs, or other forms of forensic evidence on storage medium that are necessary to draw an accurate conclusion is a dynamic process. While it is possible to specify in advance the records to be sought, computer evidence is not always data that can be merely reviewed by a review team and passed along to investigators. Whether data stored on a computer is evidence may depend on other information stored on the computer and the application of knowledge about how a computer behaves. Therefore, contextual information necessary to understand other evidence also falls within the scope of the warrant.

e. Further, in finding evidence of how a computer was used, the purpose of its use, who used it, and when, sometimes it is necessary to establish that a particular thing is not present on a storage medium. For example, the presence or absence of counter-forensic programs or anti-virus programs (and associated data) may be relevant to establishing the user's intent.

78. *Necessity of seizing or copying entire computers or storage media.* In most cases, a thorough search of the premises for information that might be stored on storage media

often requires the seizure of the physical storage media and later off-site review consistent with the warrant. In lieu of removing storage media from the premises, it is sometimes possible to make an image copy of storage media. Generally speaking, imaging is the taking of a complete electronic picture of the computer's data, including all hidden sectors and deleted files. Either seizure or imaging is often necessary to ensure the accuracy and completeness of data recorded on the storage media, and to prevent the loss of the data either from accidental or intentional destruction. This is true because of the following:

a. The time required for an examination. As noted above, not all evidence takes the form of documents and files that can be easily viewed on site. Analyzing evidence of how a computer has been used, what it has been used for, and who has used it requires considerable time, and taking that much time on premises could be unreasonable. As explained above, because the warrant calls for forensic electronic evidence, it is exceedingly likely that it will be necessary to thoroughly examine storage media to obtain evidence. Storage media can store a large volume of information. Reviewing that information for things described in the warrant can take weeks or months, depending on the volume of data stored, and would be impractical and invasive to attempt on-site.

b. Technical requirements. Computers can be configured in several different ways, featuring a variety of different operating systems, application software, and configurations. Therefore, searching them sometimes requires tools or knowledge that might not be present on the search site. The vast array of computer hardware and software available makes it difficult to know before a search what tools or

knowledge will be required to analyze the system and its data on the Premises. However, taking the storage media off-site and reviewing it in a controlled environment will allow its examination with the proper tools and knowledge.

c. Variety of forms of electronic media. Records sought under this warrant could be stored in a variety of storage media formats that may require off-site reviewing with specialized forensic tools.

79. *Nature of examination.* Based on the foregoing, and consistent with Rule 41(e)(2)(B), the warrant I am applying for would permit seizing, imaging, or otherwise copying storage media that reasonably appear to contain some or all of the evidence described in the warrant and would authorize a later review of the media or information consistent with the warrant. The later review may require techniques, including but not limited to computer-assisted scans of the entire medium, that might expose many parts of a hard drive to human inspection in order to determine whether it is evidence described by the warrant.

80. CPR ("the Company") is a functioning company that conducts business. The seizure of the Company's computers may limit the Company's ability to conduct its business with ongoing patients. As with any search warrant, I expect that this warrant will be executed reasonably. Reasonable execution will likely involve conducting an investigation on the scene of what computers, or storage media, must be seized or copied, and what computers or storage media need not be seized or copied. Where appropriate, officers will copy data, rather than physically seize computers, to reduce the extent of disruption. If employees of the Company so request, the agents will, to the extent

27

practicable, attempt to provide the employees with copies of data that may be necessary or important to the continuing function of the Companies' business. If, after inspecting the computers, it is determined that some or all of this equipment is no longer necessary to retrieve and preserve the evidence, the government will return it.

## CONCLUSION

81. Wherefore, your affiant respectfully requests that a search and seizure warrant be issued authorizing the Department of Health and Human Services, with appropriate assistance from other law enforcement officers, to enter the said described PREMISES and search the items as set forth in the search warrant.

Ryan Houston, Special Agent
Department of Health and Human Services

Sworn and subscribed to me this ___ day of July 2021.

HONORABLE ELIZABETH A. PRESTON DEAVERS
UNITED STATES MAGISTRATE JUDGE